UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARION KING O/B/O T.M.K.F.,
a minor,

                    Plaintiff,

v.

  COMMISSIONER OF SOCIAL
  SECURITY,

                Defendant.
_____/

Case No. 17-12549

Marianne O. Battani
United States District Judge

Stephanie Dawkins Davis
United States Magistrate Judge

**REPORT AND RECOMMENDATION
<u>CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkts. 13, 14)</u>**

## I.    PROCEDURAL HISTORY

    A.    <u>Proceedings in this Court</u>

On August 8, 2017, plaintiff, mother of T.M.K.F., a minor child, filed the

instant suit.  (Dkt. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule

72.1(b)(3), District Judge Marianne O. Battani referred this matter to the

undersigned for the purpose of reviewing the Commissioner's unfavorable decision

denying plaintiff's claim for supplemental security income childhood disability

benefits.  (Dkt. 4).  This matter is currently before the Court on cross-motions for

summary judgment.  (Dkt. 13, 14).

B.     Administrative Proceedings

Plaintiff filed an application for supplemental security income childhood disability benefits on July 31, 2014, on behalf of her minor child, T.M.K.F., alleging disability beginning on May 18, 2012.  (Tr. 15).[1]  The claim was initially disapproved by the Commissioner on October 30, 2014.  (*Id.*).  Plaintiff requested a hearing and on February 12, 2016, plaintiff and T.M.K.F. appeared, with counsel, before Administrative Law Judge ("ALJ") Virginia Herring, who considered the case *de novo*.  (Tr. 15-30).  On the day of the hearing, the claimant amended the alleged onset date to July 31, 2014.  (Tr. 15).  In a decision dated June 2, 2016, the ALJ found that plaintiff was not disabled.  (Tr. 30).  Plaintiff requested a review of this decision, and the ALJ's decision became the final decision of the Commissioner when the Appeals Council, on July 13, 2017, denied plaintiff's request for review.  (Tr. 1-5); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

For the reasons set forth below, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **DENIED**, that defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

---

[1] The Administrative Record appears on the docket at entry number 9.  All references to the same are identified as "Tr."

## II.    ALJ FINDINGS

The claimant, T.M.K.F., born March 22, 2004, was 11 years old at the time of the administrative hearing.  (Dkt. 13, at p. 3).  The claim for disability on T.M.K.F.'s behalf is based on the assertions that he has a history of ear infections, asthma, Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD), including a long history of disruptive behavior.  (*Id.*).

At Step I of the three-step sequential evaluation process, the ALJ found that T.M.K.F. had not engaged in substantial gainful activity since July 31, 2014, the alleged onset date.  (Tr. 18).   At Step II, the ALJ found that the claimant had asthma, a history of ear infections with bilateral myringotomy tube placements, attention deficit disorder, and a history of speech impairment, which she found to be severe impairments that caused more than minimal functional limitations.  (*Id.*) At Step III, the ALJ found that T.M.K.F. did not have an impairment or combination of impairments that met or medically equaled the Listings or that functionally equaled the Listings.  (Tr. 18-19).  In denying the claim, the ALJ evaluated T.M.K.F.'s  degree of limitation in each of the six functional equivalence domains and concluded that he did not have "marked" or "extreme" limitations in any of the six broad functional domains and thus did not functionally equal a listed impairment.  (Tr. 19-29).  The ALJ thus determined that  T.M.K.F. was not disabled from July 31, 2014, through the date of the decision.  (Tr. 29-30).

3

## III.   DISCUSSION

### A.   Standard of Review

In enacting the social security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137 (1987). If a claimant finds no relief during this administrative review process, the claimant may file an action in federal district court. *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir.1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo,

resolve conflicts in evidence, or decide questions of credibility." *Bass v.*

*McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383,

387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to

evaluate the credibility of witnesses, including that of the claimant." *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc.*

*Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a

claimant's subjective complaints and may . . . consider the credibility of a claimant

when making a determination of disability."); *Walters*, 127 F.3d at 531

("Discounting credibility to a certain degree is appropriate where an ALJ finds

contradictions among medical reports, claimant's testimony, and other evidence.").

"However, the ALJ is not free to make credibility determinations based solely

upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*,

486 F.3d at 247, quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

     If supported by substantial evidence, the Commissioner's findings of fact are

conclusive.  42 U.S.C. § 405(g).  Therefore, this Court may not reverse the

Commissioner's decision merely because it disagrees or because "there exists in

the record substantial evidence to support a different conclusion." *McClanahan v.*

*Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800

F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a

scintilla of evidence but less than a preponderance; it is such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

The scope of this Court's review is limited to an examination of the record only. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

B.    Legal Standards – Eligibility for SSI Childhood Disability Benefits

A child will be considered disabled if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations."  42 U.S.C. § 1382c(a)(3)(C)(I).  To determine whether a child's impairments result in marked and severe limitations, Social Security Administration (SSA) regulations prescribe a three-step sequential evaluation process:

> 1.  A child will be found "not disabled" if he engages in substantial gainful activity.
>
> 2.  A child will be found "not disabled" if he does not have a severe impairment or combination of impairments.
>
> 3.  A child will be found "disabled" if he has an impairment or combination of impairments that meets, medically equals, or functionally equals an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1. 20 C.F.R. § 416. 924(a)-(d).

To determine whether a child's impairment functionally equals the listings, the SSA will assess the functional limitations caused by the child's impairment.  20 C.F.R. § 416.926a(a).  The SSA will consider how a child functions in six domains:

1.    Acquiring and using information;

2.    Attending and completing tasks;

3.      Interacting and relating with others;

4.      Moving about and manipulating objects;

5.      Caring for yourself; and

6.      Heath and physical-being.

20 C.F.R. § 416.926a(b)(1).  If a child's impairments result in "marked" limitations in two domains, or an "extreme" limitation in one domain,[1] the impairment functionally equals the listing and the child will be found disabled.  20 C.F.R. § 416.926a(d).

C.      Analysis and Conclusions

1.      Functional Equivalence

Plaintiff does not appear to object to the ALJ's conclusion that the claimant's impairments did not meet or medically equal the Listings.  Rather, the appeal is related to the ALJ's assessment of whether the claimant's impairments functionally equaled an impairment in the Listings,  as assessed under the six domains found in 20 C.F.R. § 416.926a(a).  The plaintiff  must show that the ALJ's decision that he suffered from less than marked limitations in two of the six domains is not supported by substantial evidence, or that the ALJ's decision that

---

[1] A marked limitation is one that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2).  An extreme limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(3).

claimant's limitations in one of the six domains was not extreme is not supported by the substantial evidence.  Here, plaintiff only objects to the ALJ's decision regarding four of the six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, and (4) caring for yourself.  (Dkt. 13).

a.   Acquiring and Using Information

This domain considers how well a child acquires or learns information, and how well the child uses the information learned.  20 C.F.R. § 416.926a(g).[2]  The regulations provide that a school-age child without an impairment should be able to read, write, do math, and discuss history and science.  The child will use these skills in academic situations to demonstrate what he has learned, for example, by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work, and entering into class discussions.  The child will also need to use these skills in daily living situations at home and in the community (e.g., reading street signs, telling time, and making change).  The child should also be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and expressing his own ideas, and by understanding and responding to the opinions of others.

---

[2] As effective between June 12, 2015 and October 6, 2016.

Social Security regulation 20 C.F.R. § 416.926a(h)(3) gives some examples of limited functioning in this domain that children of different ages might have. The examples are not age-specific ; rather, they cover a range of ages and developmental periods.  In addition, according to the ALJ, the examples do not necessarily describe "marked" or "extreme" limitation in the domain.  Some examples of difficulty children could have in attending and completing tasks are: (i) does not demonstrate understanding of words about space, size, or time (e.g. in/under, big/little, morning/night); (ii) cannot rhyme words or the sounds in words; (iii) has difficulty recalling important things he learned in school yesterday; (iv) has difficulty solving mathematics questions or computing arithmetic answers; and (v) talks only in short, simple sentences and has difficulty explaining what he means.  20 C.F.R. § 416.926a(g)(3).

According to plaintiff, T.M.K.F.'s impairments are functionally equivalent to a Listing in this domain.  T.M.K.F. struggles with comprehension and focus, and his speech problems impact his classroom performance.  (Dkt. 13, at p. 7-8).  The claimant exhibited a moderate articulation/intelligibility disorder and performed below average in 7 out of 12 tested areas.  (*Id.* at p. 8).  The plaintiff notes that before changing schools T.M.K.F. was set to repeat the 5th grade, and while in the 6th grade in his new school his reading and writing levels were only at a 3rd grade level.  (*Id.* citing Tr. 198).  While the ALJ pointed out that T.M.K.F. has

experienced improvement at his new school, maintaining focus, following directions, sitting still and staying on task are still problem areas for him once his medication wears off at the end of the day.  Plaintiff contends that her testimony and T.M.K.F.'s teachers' questionnaires support marked limitation in this domain.

Alternatively, the Commissioner argues that the ALJ's decision that T.M.K.F. does not have marked or extreme limitation in this domain is supported by substantial evidence.   The ALJ found that as early as 2010, T.M.K.F.'s speech was "improving" (Tr. 262), and a speech and language evaluation in 2012 revealed only mild expressive language deficits and moderate articulation/intelligibility deficits.  (Dkt. 14, at p. 7; Tr. 287).  The Commissioner notes that the claimant's individualized education plan (IEP) reflected that he had no trouble reading aloud or answering questions, and he was able to pass English Language Arts assessments.  (*Id.* at p. 8; Tr. 353).  A language sample analysis in the 2015 IEP indicated that T.M.K.F. had age-appropriate vocabulary, the ability to ask and answer "Wh-" questions, appropriate topic maintenance, and logical sequencings when retelling a story.  (*Id.*; Tr. 366).  The ALJ also considered the teachers' questionnaires.  T.M.K.F.'s 6th grade teacher noted that he had no problems acquiring and using information, but also noted that he was choosing not to do work that he was capable of doing.  (Tr. 194).  Another teacher noted only two "obvious problems" in this domain: reading and comprehending written material

11

and providing organized and clear explanations.  (Tr. 219).  The Commissioner

contends that the questionnaires do not support marked limitations in this domain.

According to the Commissioner, the State agency experts' opinion, which

the ALJ also considered, also does not support marked limitation.  (*Id.* at p. 9).

Ms. Lang, the speech-language pathologist who reviewed the evidence, noted

T.M.K.F.'s test scores and his problems with articulation.  (*Id.*; Tr. 106).

However, Ms. Lang noted that T.M.K.F.'s receptive and expressive language skills

were within normal limits.  Accordingly, Ms. Lang concluded that the evidence

supported less than marked limitations in this domain.

The undersigned agrees with the Commissioner that the ALJ's decision here

is supported by substantial evidence.  As the ALJ discussed, school records do not

support a marked limitation in this domain.  While T.M.K.F.'s speech and

language abilities are noted to be a problem area for him, his speech has been

improving.  A January 2012 speech and language evaluation revealed moderate

articulation/intelligibility and mild expressive language deficits.  (Tr. 286).  His

2015 Great Oaks Academy IEP spontaneous language sample indicated that

T.M.K.F. has age-appropriate vocabulary, has the ability to ask and answer the

"Wh-" questions (who, what where, when, why, etc.), appropriate topic

maintenance, and logical sequencing when retelling a story.  (Tr. 355).  Further,

while T.M.K.F. demonstrated simple sentence structure and limited morphological

word endings, he was "always successfully able to verbally communicate." (*Id.*).

Results of the Goldman-Fristoe Test of Articulation, administered in January 2015,

revealed a mild-moderate articulation impairment, showing errors as T.M.K.F.

produces /w/ for /r/ in all word positions. (Tr. 361). The examiner noted that

despite these residual errors, T.M.K.F. is able to communicate with teachers and

peers and articulation errors did not appear to have an adverse impact on

T.M.K.F.'s education performance. (*Id.*). It was reported in the 2015 IEP that

T.M.K.F. had no trouble reading aloud in class or answering questions, was able to

pass his English Language Arts assessments, and that he likes math. (Tr. 353).

T.M.K.F.'s academic strength is math (Tr. 362), and when observed by a social

worker in math class he was able to answer a question correctly to the class. (Tr.

354). In addition to this evidence, T.M.K.F. testified that he can read street signs

and tell time on both a digital and analog clock. (Tr. 60).

The teacher questionnaires in the record provide more evidence in support of

the ALJ's decision. T.M.K.F.'s current teacher stated that he had no problems[3] in

this domain, instead noting that T.M.K.F. is choosing not to do work that he

capable of doing. (Tr. 194). This teacher also noted that he could understand

almost all of T.M.K.F.'s speech. (Tr. 197). Ms. Weldron, another teacher who

---

[3] The teachers rated T.M.K.F. on a five-point scale ranging from "no problem" to "a very serious problem." (*See, e.g.* Tr. 194).

completed a questionnaire, indicated that T.M.K.F. had obvious problems in reading and comprehending written material and providing organized oral explanation and adequate descriptions. (Tr. 219). However, Ms. Weldron did not rate these or any other functional areas as being serious problems in this domain.

Finally, as the Commissioner notes, the ALJ also considered the State agency experts' opinion. The experts' joint opinion is the only medical opinion in the record concerning functional equivalence and State agency reviewing medical sources are highly skilled medical professionals who are experts in Social Security disability evaluation. 20 C.F.R. § 1527(e)(2)(i). The physicians opined that T.M.K.F. has "less than marked" limitation in this domain. Plaintiff does not contest the State agency opinion. The State experts noted his teacher's remark that he is able to do work but is choosing not to, as well as other evidence. For example, they also noted that T.M.K.F. uses incomplete or short sentences and his mother's statements that T.M.K.F. can answer the phone, deliver a message, and provide explanations, although she stated that he was unable to repeat stories. (Tr. 106).

Plaintiff marshals some evidence in an effort to support of the position that T.M.K.F. has marked limitation here, such as the fact that as a 6th grader his reading and writing were only at the 3rd grade level and that he exhibited moderate articulation/intelligibility problems with his speech. However, as noted earlier,

"The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion." *Felisky*, 35 F.3d at 1035.  The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  The undersigned concludes that the ALJ's decision that T.M.K.F. has less than marked limitation in acquiring and using information is within the "zone of choice" and is supported by substantial evidence, and thus must be affirmed.  Having a less than marked impairment certainly does not mean that the claimant is unimpaired, but the mere existence of that impairment does not necessarily mean, as plaintiff's argument suggests, that a claimant is "markedly" impaired in a particular domain.

> b.      Attending and Completing Tasks

This domain considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the pace at which he performs activities and the ease of changing activities.  20 C.F.R. § 416.926a(h).  The regulations provide that a school-age child without an impairment should be able to focus his attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments.  The child should be able

to concentrate on details and not make careless mistakes in his work (beyond what would be expected in other children of the same age who do not have impairments). The child should be able to change activities or routines without distraction and stay on task and in place when appropriate. The child should be able to sustain attention well enough to participate in group sports, read by himself, and complete family chores. The child should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation. 20 C.F.R. § 416.926a(h)(2)(iv).

Social Security regulation 20 C.F.R. § 416.926a(h)(3) sets forth some examples of limited functioning in this domain that children of various ages might exhibit. The examples cover a range of ages and developmental periods. In addition, according to the ALJ, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty children could have in attending and completing tasks are: (i) easily startled, distracted, or over-reactive to sounds, sights, movements, or touch; (ii) slow to focus on, or fails to complete, activities of interest (e.g., games or art projects); (iii) repeatedly becomes side-tracked from activities or frequently interrupts others; (iv) easily frustrated and gives up on tasks, including ones he is capable of completing; or (v) requires extra supervision to remain engaged in an activity.

According to plaintiff, T.M.K.F.'s ability to stay on task continues to be problematic, especially when his medication wears off mid-day.  (Dkt. 13, at p. 8).  Plaintiff contends that his time management, task prioritization, and impulse resistance are markedly limited when he is "operating independently."  Psychiatric evaluations indicate that he has poor operational judgment and teachers consistently indicate serious problems on a daily basis regarding his inability to work without being distracted or distracting others.  (*Id.* at p. 8-9).  One of T.M.K.F.'s teachers noted that focusing long enough to finish assigned tasks, carrying out single or multi-step instructions, and paying attention were obvious problems.  (*Id.* at p. 9).  Plaintiff states that the teachers' opinions in combination clearly document marked limitation in this domain.

The Commissioner counters that plaintiff's argument concerning this domain is nothing more than a recitation of evidence she believes supports marked limitation.   The Commissioner contends that plaintiff's attempt is legally insufficient to carry her burden and that she mischaracterizes the evidence.  (Dkt. 14, at p. 11-12).  T.M.K.F.'s school records do not indicate marked limitation:  T.M.K.F.'s 4th grade teacher wrote that when he is focused and on task he does a "fantastic job" and that he was "typically" on task.  (*Id.* at p. 11; Tr. 256).  As part of his 2015 IEP, T.M.K.F. was observed in class by a social worker who noted that he "did not exhibit any behaviors that differed from his same-aged peers" and that

he exhibited both on and off-task behaviors (as did other students in the class), but he was focused and on task for 57% of the observation intervals.  (*Id.*; Tr. 354). The Commissioner acknowledges that one of T.M.K.F.'s teachers indicated he has a serious problem working without distracting himself or others and wrote that he was having trouble working quietly.  (*Id.* at p. 12; Tr. 195).  However, this same teacher did not note a "serious problem" in activities related to this domain.  (*Id.*; Tr. 220).  The Commissioner also points out that State agency expert Dr. Khademian considered T.M.K.F.'s current teacher's questionnaire, noting "some obvious problems per teacher's observation."  (*Id.*).  Dr. Khademian further noted T.M.K.F.'s history of ADHD and that he was on medication for this impairment. Hence, says the Commissioner, the State agency expert considered the evidence on which plaintiff relies and still concluded that T.M.K.F. has less than marked limitation in this domain.  Furthermore, plaintiff does not challenge the State agency opinion.  (*Id.* at p. 13).

In the view of the undersigned, substantial evidence supports the ALJ's decision.  While the record demonstrates that T.M.K.F. has difficulty with concentration and staying on task, the opinion evidence and teachers' statements do not note a marked impairment in this domain.  T.M.K.F.'s current teacher noted that he had a serious problem working without distracting himself or others, but that T.M.K.F. either had only an obvious problem or less than obvious problem in

the other areas evaluated in this domain.  (Tr. 195).  Ms. Weldron noted no serious

problems in this domain but obvious problems in carrying out multi-step

instructions, organizing his own things or school materials, completing

class/homework assignments, and working at a reasonable pace/finishing on time.

(Tr. 220).

　　　　Further, school records, while noting issues with his concentration and

distracting others, also note that he can focus and attend to tasks.  For example, a

social worker who observed T.M.K.F. in class noted no behaviors that were

different from his peers.  (Tr. 354).  T.M.K.F. was tapping his feet in class but

stopped when the teacher asked.  The social worker observed him sitting quietly in

class, taking notes while the teacher spoke and being attentive.  (*Id.*).  A school

psychologist observed him in another class on a different day.  This observer noted

that he was fidgety during a video and talked to peers out of turn, but overall

T.M.K.F. was focused and on task for 57% of observation intervals.  His teacher in

that class reported that T.M.K.F.'s off-task behavior was not unique in her

classroom, and that his behavior did not stand out significantly from his peers.  (Tr.

354).  It was noted in the 2015 IEP that T.M.K.F.'s inability to maintain focus

made it difficult to complete his school work and that he required program support

and classroom accommodations for his issues.  (Tr. 366).  Again, State agency

physicians considered the teachers' statements and other evidence in the record.

(Tr. 106-07).  Still, they opined  that T.M.K.F. has less than marked limitation in this domain, noting that T.M.K.F. has been on medication for his concentration/distraction issues.

In the view of the undersigned, while there may be evidence in plaintiff's favor, the ALJ's decision is supported by substantial evidence.  Moreover, even if it could be said that the ALJ erred and T.M.K.F. has marked limitation in this domain, the error is harmless because there is no other domain in which T.M.K.F. has, or could be said to have, marked or extreme limitation as discussed more fully herein.  Having a less than marked impairment certainly does not mean that the claimant is unimpaired, but the mere existence of that impairment does not necessarily mean, as plaintiff's argument suggests, that a claimant is "markedly" impaired in a particular domain.

c.     Interacting and Relating with Others

This domain considers how well a child is able to initiate and sustain emotional connections with others, develop and use the language of the community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others.  20 C.F.R. § 416.926a(i).  The regulations provide that a school-age child without an impairment should be developing more lasting friendships with children who are of the same age.  The child should begin to understand how to work in groups to create projects and

20

solve problems.  The child should have an increasing ability to understand another's point of view and to tolerate differences.  The child should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.  20 C.F.R. § 416.926a(i)(2)(iv).

Social Security regulation 20 C.F.R. § 416.926a(i)(3) sets forth some examples of limited functioning in this domain that children of different ages might have.  The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods.  In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain.  Some examples of difficulty that children could have in interacting and relating with others are: (i) does not reach out to be picked up and held by caregiver; (ii) has no close friends, or all friends are older or younger than the child; (iii) avoids or withdraws from people he knows, or is overly anxious or fearful of meeting new people; (iv) has difficulty playing games or sports with rules; (v) has difficulty communicating with others (e.g., in using verbal and nonverbal skills to express himself, in carrying on a conversation, or in asking others for assistance); or (vi) has difficulty speaking intelligibly or with adequate fluency.

Plaintiff argues that there is evidence supporting marked limitation in this domain.  Plaintiff points to a September 2015 recommendation from The

Children's Center that T.M.K.F. undergo therapy to develop coping skills for his frustration and anger to avoid resorting to aggressive and destructive behaviors. (Dkt. 13, at p. 9).  While T.M.K.F.'s attendance at therapy sessions was inconsistent, plaintiff notes that any absenteeism was due to his mother's scheduling conflicts, not carelessness.  Plaintiff also discusses T.M.K.F.'s problems at school.  As the ALJ noted, T.M.K.F. has a history of poor academic performance and frequent school suspensions for disruptive behavior.  Teachers at his new school noted that T.M.K.F. would need to be escorted to the "Intervention Room" on many occasions to settle down.  (*Id.* at p. 9-10; Tr. 193-200).  Plaintiff herself testified to T.M.K.F.'s mood swings and depressive and destructive behavior since starting the medication Vyvanse.

The Commissioner disagrees, maintaining that the ALJ's decision is supported by substantial evidence.  For example, the ALJ pointed out that T.M.K.F. testified he had friends in the neighborhood and was typically able to get along with his siblings.  (Dkt. 14, at p. 13; Tr. 26; see Tr. 48–50).  In February 2011, a teacher wrote that T.M.K.F. had "much better behavior and focus."  (Tr. 262).  While T.M.K.F. was "sent out of the [class]room often," his teacher in 2013–2014 was optimistic that he could do better.  (Tr. 256).  In February 2014, it was noted that T.M.K.F. was "polite and helpful."  (Tr. 243).  A treatment note from April 2014 included that T.M.K.F. was socializing and interacting well with

friends and family.  (*Id.* at p. 14; Tr. 274).  Other treatment notes indicate that

T.M.K.F. was in a good mood.  (*Id.*).  During an initial psychosocial assessment at

The Children's Center, plaintiff reported that T.M.K.F. "seems to better manage

his mood and impulsive behaviors when taking medication."  (*Id.*; Tr. 299).

Nevertheless, plaintiff stopped giving T.M.K.F. medication because she believed

he was becoming dependent on it.  The Commissioner notes that mental status

examinations in the record consistently reflect that T.M.K.F. presented as

cooperative with appropriate mood and affect, and normal judgment.  (*Id.*; Tr. 377,

381, 384, 387, 391, 399).  Further, while one teacher noted that T.M.K.F. was

beginning to be rude and disruptive on a regular basis, his 2015 IEP reflects that he

was getting along well with peers and in January 2016 Ms. Weldron noted that he

had no problems interacting and relating to others.  The Commissioner also notes

Dr. Khademian's notation that T.M.K.F. could be hostile and argumentative, but

also that T.M.K.F. had normal mental status examinations and that his medication

was effective.  (*Id.* at p. 14-15; Tr. 196, 221, 107).

        In the view of the undersigned, substantial evidence supports the ALJ's

decision on this domain.  Based on the record, T.M.K.F. is a child who generally

gets along with adults and with peers but sometimes gets into trouble.  T.M.K.F.'s

current teacher says he has serious problems in this domain in the areas of seeking

attention appropriately, expressing anger appropriately, following rules, and

respecting/obeying adults.  (Tr. 196).  However, other school records do not

indicate serious problems.  His reports cards for the 2012-2013 and 2013-2014

school years indicate that T.M.K.F. was a pleasure to have in class and was a sweet

boy who works hard and was well-liked by classmates.  (Tr. 256, 258).  In his 2014

IEP, it was noted that T.M.K.F. was polite and helpful doing average to above

average work in all of his course work.  (Tr. 243).  Also, in 2014, T.M.K.F.'s

issues were evaluated at The Children's Center.  The Center noted that T.M.K.F.

has difficulty at home and school but seems to better manage his mood and

impulsive behaviors when taking medication (Tr. 299); and the record indicates

that he takes medication every school day.  According to T.M.K.F.'s 2015 IEP,

T.M.K.F.'s social, emotional, behavioral, and adaptive functioning appeared to be

within normal limits and in the average range.  (Tr. 367).  In assessing T.M.K.F.'s

social needs, the administrator noted that "[t]here are no areas of clinical

significance requiring formal treatment at this time" and that T.M.K.F. no longer

needed school social services.  (*Id.*).  Ms. Weldron noted a slight problem in

expressing anger but no other problems.  (Tr. 221).  Furthermore, T.M.K.F.'s

physicians noted that he interacted well with family and friends.  (Tr. 269, 274,

290).  At the administrative hearing, T.M.K.F. stated that he plays basketball and

football on a team and that he likes to play basketball with his friends.  (Tr. 49).

T.M.K.F.'s mother testified that he does well in sports but gets angry when he

makes a mistake.  (Tr. 73).  In regard to T.M.K.F.'s speech, as discussed above

under "acquiring and using information," while he has some speech problems,

those around him can understand him, his issues do not negatively impact his

school work, and he has a normal fund of vocabulary.  As in the other domains, the

State agency physicians considered the record evidence, including a teacher's note

that T.M.K.F. was becoming rude and disruptive in class, and determined that he

has less than marked limitation in this domain.  (Tr. 107).

Again, plaintiff's argument suggests that because there is some evidence that

the claimant has some limitations in this area, the limitations must be at least

marked.  The undersigned does not suggest that T.M.K.F. has no limitations in this

regard, but some limitation does not automatically translate into a marked

limitation and the ALJ relied on evidence supporting less than marked limitations.

For these reasons, the undersigned finds that the ALJ's decision that T.M.K.F. did

not have a marked limitation in this domain is supported by substantial evidence.

### d.    Caring for Yourself

This domain considers how well a child maintains a healthy emotional and

physical status, including how well he gets his physical and emotional wants and

needs met in appropriate ways, how he copes with stress and changes in his

environment, and whether he takes care of his own health, possessions, and living

area.  20 C.F.R. § 416.926a(k).  The regulations provide that a school-age child

without an impairment should be independent in most day-to-day activities (e.g. dressing himself, bathing himself), although he may still need to be reminded sometimes to do these routinely. The child should begin to recognize that he is competent in doing some activities and that he has difficulty with others. The child should be able to identify those circumstances when he feels good about himself and when he feels bad. He should begin to develop understanding of what is right and wrong, what is acceptable and unacceptable behavior. The child should begin to demonstrate consistent control over his behavior, and he should be able to avoid behaviors that are unsafe or otherwise not good for him. He should begin to imitate more of the behavior of adults he knows. 20 C.F.R. § 416.926a(k)(2)(iv).

Social Security regulation 20 C.F.R. § 416.926a(k)(3) sets forth some examples of limited functioning in this domain that children of different ages might have. The examples do not apply to a child of a particular age; rather, they cover a range of ages and developmental periods. In addition, the examples do not necessarily describe "marked" or "extreme" limitation in the domain. Some examples of difficulty that children could have in interacting and relating with others are: (i) continues to place non-nutritive or inedible objects in their mouth, (ii) often uses self-soothing activities showing developmental regression (e.g. thumbsucking, re-chewing food), or has restrictive or stereotyped mannerisms (e.g., body rocking, headbanging); (iii) does not dress or bathe himself

appropriately for his age because he has an impairment that affects this domain;
(iv) engages in self-injurious behavior (e.g., suicidal thoughts or actions, self-
inflicted injury, or refusal to take medication), or ignores safety rules, (v) does not
spontaneously pursue enjoyable activities or interest, and (vi) has disturbance in
eating or sleeping patters.

According to plaintiff, T.M.K.F. has marked limitation in this domain
because his mother constantly redirects him at home when instructing him to
complete chores.  (Dkt. 13, at p. 10).  While T.M.K.F. is able to attend to his own
self-care, it is only after being directed by another.  Plaintiff makes a passing
reference to the opinions and medical evidence she cited earlier in her brief to
conclude that that T.M.K.F. clearly has marked limitation in this domain.

According to the Commissioner, again, the ALJ's decision is supported by
substantial evidence.  That T.M.K.F. needs to be reminded to attend to his self-care
does not show marked limitation because the regulations provide that school-age
children should be independent in most day-to-day activities, but they may still
need to be reminded sometimes to these routinely.  (Dkt. 14, at p. 15-16).  Further,
the ALJ's decision is supported by the State agency opinion, which concluded that
T.M.K.F. has no limitation in this domain.  Plaintiff does not challenge the State
agency opinion.  And, Ms. Weldron did not indicate that T.M.K.F. had any
limitations in this domain.  Additionally, T.M.K.F. is able to make meals in the

microwave, dress himself, make his bed, clean his room, bathe, brush his teeth, and feed himself.  (*Id.* at p. 16; Tr. 51, 189-90).

The undersigned agrees with the Commissioner that the ALJ's decision on this domain is supported by substantial evidence.  The record indicates that T.M.K.F. is able to bathe himself, dress himself, feed himself, and take his medication.  (Tr. 51, 52, 198, 223).  His current teacher indicated that T.M.K.F. has a serious problem using appropriate coping skills to meet daily demands, noting that T.M.K.F. gets irritated very easily, and less than a serious problem in the other areas evaluated.  (Tr. 198).  Ms. Weldron noted only an obvious problem handling frustration appropriately, but otherwise noted no problems in this domain.  (Tr. 223).  While T.M.K.F. reported thoughts of cutting his teeth with a knife three times in 2012 (Tr. 377), the record thereafter consistently indicates that T.M.K.F. did not have ideation toward harming himself or others, (Tr. 281, 282, 325, 378, 399, 403), and this ideation occurred over two years before the alleged onset date. Finally, the State agency physicians opined that T.M.K.F. has *no limitation* in this domain.  (Tr. 107).  To the extent T.M.K.F. needs to be reminded to engage in self-care activities, this does not indicate marked impairment.  The regulations specifically provide that a child without an impairment may still need to be reminded sometimes to do these routinely.  20 C.F.R. § 416.926a(k)(3).  As the ALJ stated, there are few, if any, indications in the record denoting significant

problems with self-care.  In the view of the undersigned, there is substantial

evidence supporting the ALJ's decision here.

        2.     Credibility

According to the plaintiff, the ALJ erred in her credibility determination

because she failed to comply with SSR 96-7p in discrediting T.M.K.F. for his

failure to obtain treatment without first considering any explanations for his lack of

treatment.  (Dkt. 13, at p. 11).  The ALJ indicated that T.M.K.F.'s mother did not

avail herself of the services provided by a case manager and missed several

appointments.  She contends that the ALJ was required to inquire as to why this

occurred.  Plaintiff states that she missed appointments because they were around

school times and she works a non-traditional shift.  As to T.M.K.F.'s mother's

refusal to continue treatment with The Children's Center, she states that she was

opposed to the treatment and medication choices.  In her opinion, the Center was

only interested in quick medication fixes rather than more thorough, holistic

approaches.  (*Id.* at p. 12; Tr. 74-79).  Further, plaintiff explains that she stopped

her son's medication because stopping would increase its effectiveness and

prolong the amount of time it will work before the dosage must be titrated. (*Id.*)

According to the Commissioner, the ALJ's credibility determination for both

T.M.K.F. and his mother is supported by substantial evidence.  The ALJ

discounted T.M.K.F.'s and plaintiff's subjective statements for several reasons, not

just due to a lack of treatment or noncompliance with medication.  (Dkt. 14, at p.

16-17).  The Commissioner contends that these other reasons—that medication

improved T.M.K.F.'s symptoms and that he had a normal range of daily

activities—were valid and themselves are sufficient to support the ALJ's decision.

(*Id.* at p. 17).  The Commissioner also argues that plaintiff's argument

mischaracterizes the evidence and advances post hoc rationale not present in the

record.  (*Id.* at p. 18).  The Commissioner states that the inconvenience of seeking

therapy is not a valid reason to defer treatment.  Further, plaintiff did not testify

that she left The Children's Center because she wanted a more holistic approach to

T.M.K.F.'s care.  Rather, plaintiff testified that bipolar medication was suggested,

but she preferred "little programs and things to try to help him with his focus"

without medical support.  (*Id.* at p. 19; Tr. 76).  While plaintiff claims that she

refused to start T.M.K.F. on Abilify because of suicidal ideation, the record

indicates that he did not have suicidal ideation.  As to T.M.K.F.'s noncompliance

with medication—T.M.K.F. was prescribed Vyvance, which he took for one month

before stopping—plaintiff states that she stopped the medication to prolong its

effectiveness.  However, this justification is not supported in the record.  (*Id.*).

     In the view of the undersigned, there is no compelling reason to disturb the

ALJ's credibility determination and the determination is supported by substantial

evidence.  "Credibility determinations concerning a claimant's subjective

complaints are peculiarly within the province of the ALJ." *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not required to accept the testimony of a claimant if it conflicts with medical reports, the claimant's prior statements, the claimant's daily activities, and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain or other symptoms is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, s/he must consider "the entire case record, including the objective medical evidence, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. SSR 96-7p, 1996 WL 374186, at *1; *see also* 20 C.F.R. § 416.929. "Consistency between the plaintiff's subjective complaints and the record evidence tends to support the credibility of the [plaintiff], while inconsistency, although not necessarily defeating, should have the

opposite effect." *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. Appx. 852, 863 (6th Cir. 2011).

While plaintiff is correct that an ALJ may not discount a claimant's credibility based upon "a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment," SSR 96–7p, 1996 WL 374186, at *7, an ALJ may consider a claimant's failure to comply with treatment as a reason to discount credibility. *Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988) (concluding that the ALJ properly discounted the claimant's credibility where he failed to follow prescribed treatment); S.S.R. 96–7p, 1996 WL 374186, at *8 (noting that "the individual's statements may be less credible if ... the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure."). The ruling provides potential reasonable explanations for not seeking or complying with treatment:

> * The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications.

> \* The individual's symptoms may not be severe enough
> to prompt the individual to seek ongoing medical
> attention or may be relieved with over-the-counter
> medications.
>
> \* The individual may not take prescription medication
> because the side effects are less tolerable than the
> symptoms.
>
> \* The individual may be unable to afford treatment and
> may not have access to free or low-cost medical services.
>
> \* The individual may have been advised by a medical
> source that there is no further, effective treatment that
> can be prescribed and undertaken that would benefit the
> individual.
>
> \* Medical treatment may be contrary to the teaching and
> tenets of the individual's religion.

Notably, scheduling conflicts causing a missed therapy appointment and making a

medical judgment about medication not supported by a medical professional are

not included among the reasonable explanations to be considered by the ALJ.

And, it is not improper for an ALJ to consider noncompliance or lack of treatment

in assessing credibility.

Moreover, missed therapy appointments and noncompliance with

medication were not the only factors the ALJ weighed in assessing credibility.  For

example, the ALJ noted that medications were described as working or helping his

condition.  (Tr. 20).  Indeed, his mother stated he gets angry when his Adderall

wears off and that when he takes another dose in the afternoon at school he does

better.  (Tr. 274).  His medications were noted to improve his focus or otherwise helped him, (Tr. 278, 386, 401), and teachers noticed deterioration of his behavior after the medication wore off.  (Tr. 245).  The ALJ also considered T.M.K.F.'s normal range of activities of daily living, which is inconsistent with allegations that he is markedly impaired in any domain.  (Tr. 20).  The ALJ further noted that T.M.K.F.'s teachers' statements did not demonstrate a consistent pattern of marked difficulties in any domain.  The ALJ considered T.M.K.F.'s appearance and demeanor at the hearing, stating that T.M.K.F. had few problems communicating with the ALJ during his testimony although he has a history of speech impairment. The ALJ stated that little residual evidence of that impairment was "in evidence" at the hearing.

These statements are consistent with the above discussion detailing the substantial evidence supporting the ALJ's decision that T.M.K.F. is not markedly impaired in any domain.  Having provided other reasons to discount credibility, "[s]imply [put], plaintiff's lack of treatment was not a 'determinative factor' in assessing plaintiff's credibility but was properly considered by the ALJ."  *Lee v. Comm'r of the Soc. Sec. Admin.*, 2015 WL 4394275, at *13 (E.D. Mich. June 30, 2015), *report and recommendation adopted at* 2015 WL 4394275, at *1.  Again, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of

34

observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531.  Even

if the ALJ considered an inappropriate factor such as plaintiff's stopping

medication or not attending therapy, any such error was harmless. *See Ulman v.*

*Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir.2012) (citation omitted) ("[s]o

long as there remains substantial evidence supporting the ALJ's conclusions on

credibility and the error does not negate the validity of the ALJ's ultimate

credibility conclusion, such is deemed harmless and does not warrant reversal").

### 3.     Weight Determination

Plaintiff next argues that the ALJ erred in according little if any weight to

the opinions of T.M.K.F.'s teachers.  (Dkt. 13, at p. 12).  However, it appears to

the undersigned that this argument is really an additional argument that the ALJ's

functional equivalence determination is not supported by substantial evidence.  The

plaintiff states that the ALJ did not "fully acknowledge" that the teacher

questionnaires "consistently described" T.M.K.F. as being rude and disruptive on a

regular basis.  (*Id.* at p. 13).  Plaintiff also notes that the information in the

questionnaires indicate an inability to work quietly or work at a reasonable pace.

As discussed above, not only did the ALJ consider the teacher

questionnaires in deciding on functional equivalence, so too did the State agency

physicians.  Both the physicians and the ALJ determined, based in part on the

questionnaires, that T.M.K.F. is not markedly limited in any domain.  Contrary to

plaintiff's assertion, the ALJ assigned weight to the two questionnaires, giving Ms.

Weldron's opinion great weight and T.M.K.F.'s "current teacher's" opinion some

weight because the teacher did not sign or date the document.  (Tr. 22).

Additionally, the ALJ's obligation here was to "consider" the evidence.  The

opinion of a teacher is not entitled to any particular weight, as a teacher does not

constitute an "acceptable medical source" but is rather an "other source."  *See* 20

C.F.R. § 416.913(d)(2).  As demonstrated herein, the ALJ considered and

thoroughly discussed the teacher questionnaires; in fact, the teacher questionnaires

were cited many times in the decision.  (*See* Tr. 20-22, 26-28).

To the extent plaintiff is arguing that the ALJ should have addressed every

bit of the questionnaires, the argument is unavailing.  It is well-settled that an ALJ

may consider all the evidence without discussing every piece of evidence in the

decision.  *Kornecky*, 167 Fed. Appx. at 508 ("[a]n ALJ can consider all the

evidence without directly addressing in his written decision every piece of

evidence submitted by a party.") (internal citation marks omitted).

For these reasons, the undersigned concludes that the ALJ did not err in her

treatment of the teacher questionnaires.

### 4.    Step Two

In the final argument, the plaintiff contends that the ALJ neglected to

consider the effect of T.M.K.F.'s Oppositional Defiant Disorder (ODD) at Step

Two.  (Dkt. 13, at p. 14).  Plaintiff points out that The Children's Center diagnosed T.M.K.F. with ODD.  Citing a Mayo Clinic website, plaintiff asserts that ODD is characterized by the exhibition of behaviors involving frequent and persistent patterns of anger, irritability, defiance or vindictiveness toward others.  According to plaintiff, poor school performance, impulse control problems, antisocial behavior and suicide are just a few of the undesirable long-term consequences of ODD.  (*Id.* at p. 15).  Plaintiff contends that these descriptors are "an obvious illustration" of T.M.K.F.'s behavioral issues.  Yet, the ALJ did not discuss ODD nor did she dismiss it as a non-severe impairment.  Plaintiff asserts that the ALJ had a duty to inquire further into the pathology of ODD.

In contrast, the Commissioner argues that, although the ALJ did not expressly discuss ODD, the decision reflects consideration of the symptoms and effects of this impairment.  (Dkt. 14, at p. 22).  Any error to find an impairment severe at Step Two is harmless if the ALJ's decision reflects "consideration of the cumulative effect" of all medically determinable impairments throughout the disability determination.  The Commissioner also notes that a diagnosis alone is not enough to establish a severe impairment.  (*Id.* at p. 23; citing *Higgs v Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)).

Plaintiff is correct that the ALJ did not expressly consider T.M.K.F.'s ODD diagnosis.  However, in the view of the undersigned, to the extent there is any error

in the ALJ's failure to expressly consider ODD, the error is harmless because the ALJ fully considered T.M.K.F.'s behavioral issues which make up the characteristics of ODD.  To be considered a "severe" impairment at Step 2, the claimant must have a "medically determinable impairment" that causes more than a "slight abnormality."  20 C.F.R. § 416.924(c).  An impairment is "medically determinable" when it "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3); *see also* S.S.R. 96-4p, 1996 WL 374187, at *1 (July 2, 1996) ("A 'symptom' is not a 'medically determinable physical or mental impairment' and no symptom by itself can establish the existence of such an impairment.").  An ALJ's error in excluding an impairment as "severe" at step two is not harmful so long as the ALJ finds another severe impairment, continues with the five-step analysis, and accounts for all impairments, both severe and non-severe, at the subsequent analytical steps.  *See, e.g.*, *Swartz v. Barnhart,* 188 Fed. Appx. 361, 368 (6th Cir. 2006).

As stated, the ALJ did not discuss ODD in the decision.  However, in this instance, the ALJ's error is harmless.  Although T.M.K.F. suffers from behavioral and school performance issues, there is no medical opinion in the record assessing limitations caused by ODD during the relevant period.  *Richard v. Astrue*, 2011 WL 4688788, at *5 (N.D. Ohio Oct. 4, 2011) (citing *Young v. Sec'y of Health and*

*Human Servs.*, 925 F.2d 146,151 (6th Cir. 1990) ("it is well established that a diagnosis alone does not indicate the functional limitations caused by an impairment."). The Children's Center did indeed diagnose T.M.K.F. with ODD. (Tr. 325). However, The Center's records do not discuss the effects of ODD on T.M.K.F.'s behavior. The Center noted that T.M.K.F. has a history of being defiant, having temper tantrums, and talking back to teachers. (*Id.*). The Center prescribed Vyvanse and recommended therapy. (Tr. 326). The Center did not discuss ODD beyond the diagnosis. The ALJ, however, fully discussed T.M.K.F.'s behavior issues. For example, the ALJ discussed T.M.K.F.'s mother's testimony that he has problems with anger, that he is argumentative and disrespectful (Tr. 20), and that he was disruptive and destructive. (Tr. 21). Moreover, as addressed above, the ALJ also considered the other evidence in the record pertaining to disruptive behavior and difficulty coping with frustration or anger. In short, although the ALJ did not expressly discuss ODD, she did expressly discuss what plaintiff says are the symptoms of ODD[4] and still determined that T.M.K.F. is not disabled. *Warsinski v. Comm'r of Soc. Sec.*, No. 13-14136, 2014 WL 6974670, at *10 (E.D. Mich. Dec. 9, 2014) ("I suggest that

---

[4] In arguing that the ALJ should have considered T.M.K.F.'s ODD to be severe, plaintiff cited a website to explain what symptoms are typically associated with ODD rather than citing to a medical opinion or record stating that T.M.K.F. suffers from certain symptoms of ODD. Plaintiff was unable to cite to the record to explain the symptoms because there is no record discussing symptoms of ODD.

any failure to designate ADHD as severe or non-severe was harmless error where the ALJ considered the [symptoms of] ADHD as well as records from examiners who considered the ADHD, and there is no evidence of limitations related to the same that were not already addressed by the RFC.").  For these reasons, the undersigned suggests that the ALJ did not commit reversible error at Step Two.

## IV.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **DENIED**, and that defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of*

*Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d).  The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 6, 2019                         s/Stephanie Dawkins Davis
                                               Stephanie Dawkins Davis
                                               United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on <u>February 6, 2019</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                               s/Tammy Hallwood
                                               Case Manager
                                               (810) 341-7850
                                               tammy_hallwood@mied.uscourts.gov